ORIGINAL

FILED

OCT 11 2013

U.S. COURT OF
FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

L.R. COSTANZO CO., INC., )
)
Plaintiff, )
)
v. )    Civil Action No. 13-792 C
)
THE UNITED STATES OF AMERICA, )
)
Defendant. )
_____ )

## COMPLAINT

Plaintiff, L.R. Costanzo Co., Inc. ("LRC"), by and through the undersigned counsel, for its Complaint against the United States, alleges as follows:

### PARTIES

1.    Plaintiff LRC is a corporation duly organized pursuant to the laws of the Commonwealth of Pennsylvania with its principal place of business located at 123 North Main Avenue, Scranton, Pennsylvania, 18504.

2.    Defendant is the United States of America ("Defendant"), acting by and through the Baltimore District of the U. S. Army Corps of Engineers ("the Corps" or "USACE").

### JURISDICTION

3.    This Court has jurisdiction pursuant to 28 U.S.C. § 1491 and the Contract Disputes Act of 1978, ("CDA"), 41 U.S.C. § 601 *et seq.*

4.    This action involves a construction project known as the Command Control Communication Intelligence Surveillance Reconnaissance Finishing Center (the

(the "Finishing Center") at the Tobyhanna Army Depot in Tobyhanna, PA (Contract No. W912DR-09-C-0049) (the "Project").

     5.     The Project is owned by the Defendant.

     6.     LRC is a general construction contractor regularly engaged in performing general construction work and services.

     7.     On August 7, 2009, the USACE, acting on behalf of the Defendant, entered into a $13.4 million contract with LRC to perform general construction work on the Project, Contract No. W912DR-09-C-0049 (the "Contract").

     8.     LRC entered into a subcontract with John P. Kearney and Associates, Inc. ("JPK") to perform electrical work on the Project.

     9.     LRC also entered into a subcontract with HVAC subcontractor, H.T. Lyons, Inc. ("HTL") to perform heating, ventilation and air conditioning (HVAC) work on the Project.

     10.     Soon after construction on the Project began, however, LRC discovered that the plans, designs and specifications provided by USACE during the bid process (the "Plans") were fundamentally flawed.

     11.     The Defendant's lack of design coordination had caused a discrepancy between the infrastructure of the Finishing Center, as originally designed, and the infrastructure necessary to accommodate the equipment the building was intended to house.

     12.     Most significantly, the electrical power system within the new building was insufficient to support the paint and blast booth loads, process systems including the

festooning system and hand-sanding dust collector system, as well as building systems such as the overhead doors and overhead crane.

13.   As a result of the Defendant's design errors, the entire electrical system had to be redesigned and reconfigured.

14.   Because of USACE's untimely redesign of the electrical system and the subsequent impacts to the construction process, the Project, as a whole, was significantly delayed beyond the completion dates anticipated when LRC, and its subcontractors, bid the Project.

15.   As a direct and proximate result of these delays, LRC and its subcontractors incurred delay costs for which they have never been compensated.

16.   On or about May 25, 2012, LRC submitted to the USACE a Request for Equitable Adjustment ("REA") relating to the Project.

17.   LRC's REA addressed the unanticipated costs incurred by LRC as a result of the Defendant's defective plans and specifications, constructive changes and excessive delays.

18.   LRC's subcontractors also incurred additional, unanticipated costs as a result of the Defendant's actions.

19.   For that reason, LRC submitted, on JPK's behalf, a request for equitable adjustment seeking recovery of JPK's incurred costs ("JPK REA").

20.   Similarly, LRC submitted a request for equitable adjustment on behalf of HTL (the "HTL REA," collectively with the REA and the JPK REA, "the REAs").

21.     The HTL REA sought recovery of the extended home office overhead and field management labor/resource costs incurred by HTL as a result of the Defendant-caused delays to the Project.

22.     On several occasions following the submission of the REAs, the USACE requested additional information from LRC, JPK and/or HTL.

23.     LRC and its subcontractors promptly responded to each such request.

24.     Most notably, on or about August 13, 2012, the Corps sent LRC a letter ("Serial Letter C-0146") that requested that LRC provide the Corps with certified cost and pricing data relating to the REAs, pursuant to FAR Subpart 15.408, Table 15-2[1].

25.     LRC responded on or about October 9, 2012 via Serial Letter L-90, sending the Corps eight (8) binders containing the requested certified cost and pricing data.

26.     Serial Letter L-90 also addressed all of the Corps' outstanding requests for information.

27.     LRC expended significant effort and costs in assembling the information and certified cost and pricing data requested and/or demanded by the Corps, including, but not limited to, attorneys' fees.

28.     The Corps repeatedly assured LRC that the materials that LRC had assembled would be carefully reviewed, and that a final determination concerning the REAs would be issued promptly.

---

[1] Although Serial Letter C-0146 cited to FAR Subpart 15.2, LRC concluded that this was an inadvertent error, and thus provided documentation in accordance with Subpart 15.4, which governs certified cost and pricing data.

29.     LRC met with the Corps in January 2013 to answer any final questions
USACE had about the REAs.

30.     Following that meeting, the Corps indicated that it did not have any
further questions regarding the REAs.

31.     Accordingly, after that time, LRC was under the impression that USACE
was actively reviewing the REAs, and that the Corps would be rendering a decision
concerning such REAs within a few weeks.

32.     The Corps, however, did not provide the expected determination decision
and so, on March 15, 2013, LRC again contacted the Corps and asked for an update
concerning the status of the REAs.

33.     The Corps never responded.

34.     Despite the Corps' numerous assurances that the REAs were being
considered, the Corps failed to ever issue a final decision regarding the REAs.

35.     Accordingly, on or about July 19, 2013, LRC submitted a certified claim
("the Claim") on behalf of itself, JPK and HTL.

36.     The Claim sought compensation for the additional and unanticipated costs
incurred by LRC, JPK, and HTL as a result of the defective plans and specifications and
government-caused delays relating to the Project.

37.     With the Claim, LRC submitted eight (8) binders worth of supporting
documentation; this was the same information that had been provided to the Corps with
Serial Letter L-90, over eight months prior to the submission of the Claim.

38.     The Corps did not issue a Contracting Officer's Final Decision ("COFD") relating to the Claim within sixty (60) days of submission in keeping with FAR § 33.211(c)(2).

39.     Rather, on August 15, 2013, the Corps issued a letter ("Extension Letter"), which stated that the Contracting Officer would issue a COFD by January 31, 2014.

40.     In the Extension Request, the Corps opined that the extension of the deadline by which it had to file the COFD was "a reasonable amount of time for consideration of your claim based on the size of the claim in relation to the contract price and the technical and legal issues involved."

41.     Contrary to the Corps' contentions, however, an extension is neither reasonable nor warranted.

42.     Indeed, since October 9, 2012, the Corps has had in its possession *all* the documentation necessary to reach a determination concerning the Claim.

43.     As such, an extension of another four months is far from "reasonable" within the meaning of FAR § 33.211(d).

44.     The Corps' failure to issue a COFD within the time limits set forth in FAR § 33.211, therefore, must be deemed a denial.

45.     This Court has jurisdiction over the appeal of such a "deemed denial" Claim.

## FACTUAL ALLEGATIONS

### Solicitation, Contract Award and the Addition of Booth Equipment Work

46.     On May 18, 2009, USACE issued Solicitation No. W912DR-09-R-0025 ("the Solicitation"), seeking proposals in connection with the construction of the Finishing Center.

47.     This Solicitation included plans and specifications drawn up by the Corps.

48.     LRC was awarded the Contract.

49.     The scope of work under the Contract was for the construction of a 77,000 square foot building, including both occupied and unoccupied space.  The building consisted of a structural steel building shell, including basic HVAC, electrical, bridge crane, festooning, fall protection, air curtains and plumbing for an office area and an open plant finishing area.

50.     The singular purpose of the Finishing Center was to house paint and blast booth equipment; however, the original Contract did not initially include the actual paint and blast booth equipment itself.

51.     Nonetheless, at the time the Contract was awarded, it was understood by all parties that the Contract would be modified, amended, or otherwise supplemented to include the paint and blast booths, and further, that such paint and blast booth work would be awarded to LRC.

52.     Given the intended purpose of the building, and the forthcoming revision to the scope of Contract work, LRC reasonably expected at bid time that the building structure as a whole (as well as its components and its mechanical and electrical

7

infrastructure) would fulfill the Finishing Center's intended purpose to accommodate paint and booth blast equipment, and all other required process and building systems.

53.    As expected, LRC was later awarded Contract Amendment P00003, the scope of which included the actual paint and blast booth equipment.

54.    After award of the Contract, LRC entered into subcontracts with JPK and HTL, to perform electrical and HVAC work, respectively.

55.    The Corps issued the Notice to Proceed on September 4, 2009.

**Electrical Design Problems Discovered**

56.    From the very outset of the Project, it was evident that the Corps had made several serious design errors.

57.    LRC discovered that the building structure, its components, and its mechanical and electrical infrastructure as designed by the Corps were not adequately designed to accommodate the specified booth equipment.

58.    Specifically, it was discovered during the review of booth submittals that the electrical power system within the new Finishing Center was insufficient to accommodate the booth electrical loads and, hence, the entire electrical system (including transformers, switchgear, additional panels and breakers, conduit and wire sizes) would have to be reconfigured.

59.    As a result, the prior electrical conduit design (including routing, size, and configuration) in LRC's Contract was rendered moot, and there was a general lack of information provided by the Corps concerning how to proceed with regard to the electrical work on the Project.

60.    Furthermore, the electrical switchgear had to be resized, and the transformer had to be changed.

61.    LRC sent numerous Requests for Information ("RFIs") seeking information about the reconfigured electrical work (collectively, "the Electrical RFIs"), including but not limited to:

      (a)    RFI #0055, which noted a general lack of design detail in the Plans and expressed LRC's concern that there would be interference between the electrical transformer and the oil/water separator.

      (b)    RFI #0066, which noted the lack of electrical power design information necessary for completion of the overhead door electrical work.

      (c)    RFI #0074, which contained LRC's request for information concerning the fall protection system's power design.

      (d)    RFI #0094, which sought further information concerning electrical feeder design requirements. In this RFI, LRC sought advice concerning a discrepancy in the amps associated with Panel MP2. LRC therein noted that the electrical feeder design requirements, if changed, might cause changes in all designs including general, mechanical, electrical, plumbing and specialty disciplines.

62.    In addition, in June 2010, LRC again requested additional information specifically related to the electrical switchgear design — LRC had previously submitted to USACE a switchgear design, and had received no direction from the Corps in response to such submission.

63.    Repeatedly, LRC questioned the adequacy of the power supply on the Project.

64.     LRC repeatedly warned the Corps that it had, as evidenced by the litany of Electrical RFIs above, encountered various additional problems relating to the electrical system.

65.     The failure of the overhead doors, overhead crane, and other major components to power-up, and the issues with the feeds to the paint and blast rooms, were specifically cited as ongoing problems.

66.     Around the same time, LRC again informed USACE that the electrical switchgear needed to be resized, and that the transformer should be changed.

67.     LRC advised USACE that the switchgear issues were creating, and would continue to create, major delays to the Project schedule.

68.     Nonetheless, the various Electrical RFIs and letters submitted to USACE by LRC between the initial discovery of the electrical design issues and June of 2010 went unanswered for significant periods of time.

69.     In fact, LRC and JPK were forced to constructively suspend work with respect to the underground service rough-in, pending USACE's delayed approval of the switchgear design.

70.     Without USACE's approval of the location of the JPK's service and distribution equipment, JPK was unable to install the majority of its conduit rough-ins underground as originally planned; instead, this work had to be performed overhead.

71.     The extraordinary six-month delay in the return of its shop drawings, combined with the changed manner of installation forced JPK and LRC to perform work out of sequence and in a far less efficient manner than planned, thereby incurring substantial additional and unanticipated costs.

72.     When USACE finally returned JPK's shop drawings "approved as noted," the notes on those drawings significantly modified the existing switchgear design, and added a second switchgear.

73.     In any event, the receipt of the "approved as noted" shop drawings only released Switchboard #1 for procurement, as modified by USACE; the Corps did not release the newly added Switchgear #2.

74.     Accordingly, as of August 2010, the Project had no definitive, complete electrical design.

75.     LRC's Electrical RFIs were ultimately answered (RFI #55 on July 23, 2010 and the remaining Electrical RFIs on September 23, 2010), but they provided no additional information.

76.     Rather, USACE referenced forthcoming electrical design documents that it was still developing.

77.     USACE failed to respond to various submittals made by LRC during this period and through the summer of 2010.

78.     Because the Corps failed to respond, LRC lacked the requisite information necessary to proceed with the Contract work.

79.     The Corps' delays in providing the requisite information prevented LRC from completing the Contract work in accordance with the actual schedule.

80.     Moreover, LRC's various subcontractors could not proceed with their own work due to insufficient information – information that LRC could not provide its subcontractors because USACE had not provided it to LRC.

81.     The Corps' failure to act began a ripple effect that could never be remedied, and ultimately resulted in substantial delays to the Project as a whole.

82.     At every juncture, LRC attempted to minimize the Project delay and mitigate its costs, but received little or no cooperation from USACE.

83.     Despite LRC's repeated attempts to remedy these various problems, the Corps was lax in responding to LRC's requests for information, and failed to redesign an adequate electrical system in a timely fashion.

**Inadequate Redesign of the Electrical System**

84.     Because the Corps failed to provide correct and/or complete information, LRC and JPK were unable to start the contractually- mandated coordination study (a study designed to isolate any potential problems in an electrical system) within the time frame necessary to meet the original schedule deadlines.

85.     All subsequent electrical work, therefore, was further delayed.

86.     Throughout June and July of 2010, USACE continued its discussions with LRC concerning design specification changes dealing with the booth submittals and electrical design changes.

87.     During this time, USACE was focused primarily on LRC's previous determination that the switchgear was undersized.

88.     LRC advised USACE that a revision to the electrical design would cause extraordinary delays, characterizing the potential revisions to the switchgear design in particular as a "major hit."

89.     Although LRC did not yet know the *specific* revisions USACE planned to make, it recognized that changes of this magnitude would in any case delay the Project's overall construction.

90.     Accordingly, on July 22, 2010, LRC sent USACE a proposed revised schedule demonstrating the potential impacts of the pending electrical revisions on the schedule.

91.     This revised schedule showed Project completion occurring on August 3, 2011; this completion date was based on the assumption – confirmed by the Corps – that the electrical system revisions would be timely finalized, leaving LRC sufficient time to complete the redesigned work in accordance with the revised schedule.

92.     Seemingly impervious to LRC's warnings concerning the schedule, or the additional delays caused by its failure to *finalize* revisions to the electrical designs, USACE did not provide LRC with its formal proposed changes to the switchgear design (or changes for the power requirements for the overhead crane, fall protection and overhead door) until August 4, 2010, one day after the proposed revised Project completion date.

93.     Unfortunately, the Corps' design revisions provided to LRC did not completely or adequately resolve all of the problems with the Corps' initial electrical design for the Project.  Nor, did the Corps' redesign address the related structural steel load issues.

94.     Accordingly, anticipating continued problems and delays, LRC again served formal notice of Project delay to USACE on August 23, 2010.

95.     In that notice, LRC noted that the delays in the progress of the work had been caused by "changes in the work, late approval of shop drawings, late approval of submittals, late responses to requests for information, and final resolution to submitted Requests for Proposals."

96.     LRC further noted that "[t]hese events have, and will, prevent L.R. Costanzo from completing the Project in the time set forth in the contract documents."

97.     Finally recognizing that the electrical issues had to be remedied, USACE issued a number of Requests for Proposals (RFPs) between August 23, 2010 and September 27, 2010.

98.     Each dealt with additional proposed electrical design changes.

99.     Specifically, the government issued RFPs concerning:

    (a)     the AW-Transformer and Switchboard ("RFP AW");

    (b)     the AU- Switchboard changes ("RFP AU"); and

    (c)     the AX- Transformer wall ("RFP AX").

100.     The issuance of these RFPs demonstrates that the USACE knew that there was a cost impact to the Project for the electrical changes demanded by the Corps.

101.     Nevertheless, the Corps refused to address, let alone remedy, a *systemic* design problem in its entirety, or in a cohesive, coordinated manner.

102.     Rather than acknowledge that a systematic overhaul of the Project's electrical system was necessary, USACE's approach to the electrical system deficiencies was an attempt to correct each problem in a haphazard and piecemeal fashion.

103.     USACE's decision to address the electrical problems in this fashion created additional delays and additional costs to the construction process.

104.    It also caused LRC to incur additional expenses in connection with responding to each separate RFP, especially those dealing with issues LRC had already attempted to address with USACE.

105.    As a result, various problems with the Project's design remained unresolved.

106.    Most importantly, the building roof structure remained incapable of supporting the weight of the blast booth makeup air units.

107.    LRC notified USACE of this fact on August 27, 2010.

108.    In addition, on September 28, 2010, LRC recorded in the Quality Control System ("QCS") log that the equipment loads on the roof were still wrong.

109.    LRC also discovered that, as a consequence of USACE's previous (inadequate) redesigns to the electrical system, certain changes to electrical room 205B's equipment layout were now necessary.

110.    Installation of Switchgear #1 was further delayed pending USACE's design of the Main Service and Electrical Room and revisions to Switchboard # 2.

111.    Moreover, because the switchgear location had been changed to remedy previously-discovered problems, the prepared below-grade opening in the foundation wall was not large enough to accommodate the conduit.

112.    Separate penetrations would have to be core drilled into the cast in place foundation wall, which would require additional excavation for the added conduit.

113.    This delay, in turn, prevented placement of the slab on grade in certain areas and accordingly caused further delays to the Concrete Masonry Units ("CMUs"),

metal stud and gypsum wall board assemblies, paint, and Mechanical and Electrical Plumbing ("MEP") overhead work.

114.    LRC informed USACE of these anticipated delays on October 13, 2010 in the contractually-mandated Electrical Distribution Preparatory meeting.

115.    Despite the apparent acknowledgement by USACE of vast design deficiencies, existing problems lingered as new deficiencies were discovered.

116.    All the while, the progress of the work was being critically delayed.

**The BD Modification**

117.    In late fall of 2010 the Corps issued Contract Modification P-00013 ("the BD Modification").

118.    The BD Modification stated that it was issued pursuant to Federal Acquisition Regulation ("FAR") § 52.243-4, Changes.

119.    The BD Modification addressed certain necessary switchgear changes and the power requirements for the overhead crane, fall protection and overhead doors.

120.    It did not, however, purport to address all of the issued identified as of that date.

121.    Most notably, the modification failed to address the structural roof load issues.

122.    The BD Modification extended the time frame for completion of the Project by only 90 days, a wholly inadequate amount of time in which to finish the BD Modification work.

123. Moreover, USACE unilaterally determined the price increase associated with the BD Modification; this amount was meant to be *inclusive* of LRC's direct and indirect costs.

124. The adjustment in Contract price occurred without any input from LRC or the relevant subcontractors, and seemingly without any realistic evaluation of the costs associated with the materials and services necessary to complete the modified scope of work.

125. Correctly anticipating that the unilaterally-amended Contract price would be less than the actual costs expended by LRC and/or its subcontractors to complete the BD Modification Work, LRC responded to the Corps' unilateral BD Modification via letter dated November 23, 2010 indicating: (1) that the change amount was insufficient to cover the work; (2) that it estimated that the *direct* portion of the cost would be nearly triple the amount set by the Corps; and (3) the 90 day time extension granted by USACE was inadequate.

126. LRC also advised the Corps that LRC's (and/or its subcontractors') performance of BD Modification work did not derogate its rights to seek equitable adjustment associated with the changes, pursuant to the FAR.

**Further Delays by the Corps and Attempted Negotiation of Unilateral Contractual Price Adjustment**

127. Because the BD Modification had not addressed all of the electrical design (and related) issues – including, but not limited to, the equipment loads on the roof – those issues lingered, causing additional problems and associated delays to the Project.

128. In fact, the BD Modification failed to adequately address or remedy even those problems it was specifically meant to address.

129.     Moreover, the Corps failed to make the scope of the BD Modification clear; the then-current electrical drawings grouped *all* of the existing electrical system revisions together on one diagram, rendering it impossible to ascertain what work was, and what work was not, part of the *revised* electrical system.

130.     Although LRC sought additional information to clarify the remaining electrical issues, the Corps was extremely slow in responding.

131.     The Corps' excessive delay in providing LRC and its subcontractors with the requested information made it impossible for LRC and/or its subcontractors to timely and efficiently complete the BD Modification work.

132.     Although the Corps continued to provide little to no responsive information, LRC was compelled to begin what work it could under the BD Modification in order to avoid any further interruptions and impacts to the already much-delayed Project schedule.

133.     JPK, therefore, commenced electrical work in connection with the revised electrical design (specifically, the ductbank) on or about November 15, 2010.

134.     The limited funding allocated for the BD Modification Work was grossly inadequate in relation to the costs necessary to actually perform the associated work, and thus all funding was credited directly to JPK, the electrical subcontractor performing such work.

135.     In fact, the amount earned by, and credited to, JPK *exceeded* the funding provided to LRC by the Corps under the BD Modification, which forced LRC to fund the BD Modification work.

136. Further, JPK's verified time and materials costs exceeded even the amount credited to them.

137. Therefore, while it attempted to clarify and coordinate the scope of the BD Modification, LRC simultaneously also sought a price adjustment for the undervalued sum chosen by the Corps.

138. From the start of the BD Modification work to December 21, 2012, the USACE's representatives signed daily work tickets approving the BD Modification Work.

139. USACE and LRC met on December 22, 2010 to discuss the various issues concerning the BD Modification price, which LRC had previously expressed in its November 23, 2010 letter to the Corps.

140. Although LRC was assured that USACE would adequately address at this meeting the issues LRC had raised, USACE instead declared at the meeting that the unilaterally-derived figure of $556,634 would not be negotiated or increased.

141. At the December 22, 2010, the USACE directed its representatives to stop signing daily work tickets with respect to the BD Modification work.

142. Despite the USACE's refusal to sign work tickets, LRC continued to submit daily work tickets for the BD Modification work.

143. The Corps also refused to provide LRC with the basis of its own cost estimate.

144. Instead, USACE unilaterally issued another contract modification on March 30, 2011.

**The BP Modification**

145. This modification, P-00019 ("BP Modification"), changed the Contract to provide for electrical design changes that were, according to USACE, mistakenly left out of the BD Modification.

146. Like the BD Modification, the BP Modification was also made pursuant to the FAR Changes clause at Section 52.243-4.

147. Like the BD Modification, it failed even to address all of the outstanding issues on the Project, and failed to actually remedy even those issues it purported to address.

148. The BP Modification increased the total Contract amount by $609,731, for a total of $1,166,365.

149. Still, the total adjustment in Contract price remained wholly insufficient to cover the costs incurred by LRC and its subcontractors as a result of the Defendant's design errors and/or omissions with respect to the Project.

150. LRC, JPK and HTL have never been fully compensated for their work on the Project in that the cost impacts of the Corps' design changes have never been fully paid to the Plaintiffs.

**BJ Modifications**

151. The electrical system was not the only area in which the Project plans and specifications were seriously flawed and/or incomplete.

152. There were also certain issues relating to the steel infrastructure of the Project.

153.    Accordingly, on December 2010, and on February 4, 2011, respectively, the Corps issued Contract Modification No. P00016 ("BJ-1 Modification") and Contract Modification No. A0004 ("BJ-2 Modification").

154.    These Modifications instructed LRC to analyze the numbered joists for the load conditions noted on the Plans, and provide shop drawings for any additional joists determined to be necessary, or for those existing joists requiring modification.

155.    The BJ-2 Modification also asked that LRC install bar joists as necessary.

156.    The BJ-1 Modification increased the Contract Amount by $12,712.00; the BJ-2 Modification further increased the Contract amount by $74,188.00.

157.    Neither the BJ-1 nor BJ-2 Modifications allowed for additional Contract time.

158.    As it had done with the BD/BP Modification work, USACE greatly underestimated the costs associated with the work required under the BJ-1 and BJ-2 Modifications.

159.    LRC quickly accumulated costs in excess of the amounts provided for in BJ-1 Modification and BJ-2 Modification.

160.    Accordingly, on March 11, 2011, LRC issued Change Request #CR047, providing the Corps with information concerning the expenses incurred in relation to the BJ-1 and BJ-2 Modifications and requesting an increase in the Contract price adjustment associated with these Modifications.

161.    In the Change Request, LRC indicated that it had incurred expenses in connection with the work performed under the BJ-1 and BJ-2 Modifications, and that this amount exceeded the amount provided for in the two modifications.

162.     The Corps, having not yet paid LRC the amounts provided for in the BJ-1 or BJ-2 Modifications, agreed to pay LRC a total of $103,163.00 (rather than the previous total of $86,900.00), and issued a corresponding Modification.  ("BJ-3 Modification").

163.     In addition to paying LRC an additional $103,163.00, BJ-3 Modification added an additional 28 days to the Project's schedule.

164.     This amount, too, failed to properly compensate LRC and its subcontractors for the costs incurred as a result of the changes.

**H-Wall and Concrete Apron Issues**

165.     Due to the other changes to the electrical system design, the housing of the transformer also had to be modified.

166.     The Corps decided that an "H-Wall" should now house the exterior transformer at the Finishing Center.

167.     In connection with this change, USACE issued Modification P-00011 ("AX Modification").

168.     Pending issuance of the AX Modification, construction of the wall had to be suspended awaiting the Corps' ongoing revisions with respect to the enclosed transformer itself.

169.     If not for this transformer change, the exterior construction work would have been completed prior to the onset of winter weather conditions.

170.     When LRC submitted its bid on the Project, it had no reason to anticipate and/or expect that it would incur costs associated with winter protection and/or performing construction activities in the winter months.

22

171.   However, due to USACE's delay, the electrical systems were not sufficiently revised to enable LRC to start H-Wall construction until approximately November 18, 2011.

172.   This pushed the construction of the H-Wall into winter months

173.   As a result, LRC was forced to incur costs associated with performing various winter weather activities.

174.   These activities included thawing of frozen ground, use of lean concrete backfill in lieu of compacted soil, and use of insulation blankets on both the H-Wall and concrete apron to prevent concrete failure.

175.   As a result of these activities, LRC incurred $14,340.47 in unanticipated costs in connection with H-Wall construction.

176.   LRC was never compensated for these costs.

**Ultimate Project Completion**

177.   Although the Project was ultimately completed, the combination of design errors, piecemeal revisions, untimely responses and insufficient contract modifications severally delayed the Project's completion past the contemplated completion date.

178.   The Project was substantially completed on November 18, 2011, a total of 268 calendar days beyond the original, planned completion date.

179.   The electrical scope of work was not completed until October 30, 2011, 319 days after it was initially scheduled to be finished.

180.   Due to delays entirely caused by the Defendant, the actual duration to achieve substantial completion of the Project was 808 calendar days, instead of 540 days as anticipated by LRC at the time it bid the Project.

181.    Even though it was solely at fault for the massive delays on the Project, the Corps unjustly withheld $115,353.00 in liquidated damages from LRC.

182.    Due to USACE's untimely redesign of the electrical system and the subsequent impacts to the construction process, LRC and its subcontractors incurred significant additional costs performing the redesign work for which they have not been fully compensated by USACE.

183.    LRC and its subcontractors also incurred substantial damages as a result of the delay caused by the Corps' design errors and omissions for which they have not been fully compensated for these costs.

### COUNT I – JPK SUBCONTRACTOR PASS THROUGH CLAIM[2]

184.    LRC incorporates the foregoing as if set forth at length herein.

185.    As set forth above, as a result of the Defendant's constructive changes, defective and specifications and plans, and delays, JPK incurred substantial unanticipated costs.

186.    JPK is, therefore, entitled to compensation from the Defendant for those costs.

187.    LRC is entitled to overhead and profit on the amount due to JPK.

WHEREFORE, Plaintiff requests judgment in excess of $1,683,786.72 against Defendant, plus interest, costs, and attorneys' fees allowed by law, and such other relief as the Court deems appropriate.

---

[2] This Count includes both the amount due to JPK and LRC's allowable markup on such amount.

## COUNT II – HTL SUBCONTRACTOR PASS THROUGH CLAIM[3]

188.    LRC incorporates the foregoing as if set forth at length herein.

189.    As set forth above, as a result of the government's constructive changes, defective and specifications and plans, and government-caused delays, HTL incurred substantial unanticipated costs.

190.    HTL is, therefore, entitled to compensation from the Corps for those costs.

191.    LRC is entitled to overhead and profit on the amount due to HTL.

WHEREFORE, Plaintiff requests judgment in excess of $342,485.22 against Defendant, plus interest, costs, and attorneys' fees allowed by law, and such other relief as the Court deems appropriate.

## COUNT III – LRC BREACH OF CONTRACT CLAIM

192.    LRC incorporates the foregoing as if set forth at length herein.

193.    As set forth above, throughout Contract performance, LRC was continuously confronted with design issues and problems that were not its fault.

194.    As multiple design issues arose, these problems created a cumulative impact upon the progress of the work on the Project.

195.    For each problem that developed, a general ripple effect ensued. The problems listed above created non-productive construction conditions, and contributed to the overall delay of Project's completion.

196.    As a result of the Defendant's constructive changes, defective and specifications and plans, and delays, LRC incurred costs for which it has never been compensated.

---

[3] This Count includes both the amount due to HTL and LRC's allowable markup on such amount.

197.    The Corps' caused excessive delays, but failed to adequately adjust the Contract time accordingly.

198.    The Corps, therefore, breached the Contract in various ways, including but not limited to, the following:

(a)    the issuance of defective plans and specifications;

(b)    making "constructive changes" to the Project's design and directing LRC to perform work outside the scope of the Contract but failing to compensate LRC for such work;

(c)    failing to timely respond to RFIs and submittals, or approve shop drawings;

(d)    unreasonably constructively suspending all electrical work; and/or

(e)    refusing to adequately compensate LRC for work performed in connection with the Project.

199.    As a result of these breaches, LRC has suffered, and will continue to suffer, damages.

200.    As a result of the Defendant's breach of contract, LRC has been forced to lay-off employees.

201.    LRC is entitled to an adjustment in both the contract price, and contract duration, as compensation for these damages.

WHEREFORE, Plaintiff requests that this Court issue an order, finding in favor of Plaintiff, and:

1.    awarding Plaintiff judgment in excess of $944,825.04 against Defendant;

2.    ordering remission of the liquidated damages assessed against Plaintiff, in the amount of $115,353.00;

3.   ordering Defendant to adjust the contract by 268 days to account for the government-caused delays; and/or

4.   awarding Plaintiff interest, costs, and attorneys' fees allowed by law, and such other relief as the Court deems appropriate.

Respectfully submitted,

Dated: _10-10-13_

_____
Michael H. Payne, Esquire
Cohen Seglias Pallas Greenhall
     & Furman PC
United Plaza, 19th Floor
30 South 17th Street
Philadelphia, PA 19103
Tel: 215-564-1700
Fax: 267-238-4456
e-mail: mhpayne@cohenseglias.com
*Attorneys for Plaintiff*
*L.R. Costanzo Co., Inc.*

Of Counsel:

Jason A. Copley, Esquire (*admission pending*)
Maria L. Panichelli, Esquire
Cohen Seglias Pallas Greenhall & Furman PC